# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MATTHEW MCCOY,

     **Plaintiff,**

v.                              **No: 16cv1377 MCA/LF**

DAN HOUSTON, in his individual capacity,
MANUAL GONZALES, III, in his individual
capacity, RUDY MORA, in his individual
capacity, LIEUTENANT PETE GOLDEN,
in his individual capacity, BERNALILLO
COUNTY, ex rel. THE BERNALILLO COUNTY
SHERIFF'S OFFICE and THE BOARD OF
COUNTY COMMISSIONIERS,

     **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion for Summary Judgment and Motion to Dismiss* [Doc. 58]. The Court has considered the parties' submissions and the relevant law, and is otherwise fully informed. For the following reasons, the Court **GRANTS in PART and DENIES in PART** Defendants' *Motion.*

## I. Background

Plaintiff began working for the Bernalillo County Sheriff's Office (BCSO) in 2000 as a cadet. He was promoted to Sergeant in 2013. [Defs' Statement of Material Facts (SMF) ¶ 1; Pltf's Response, ¶ 1] In December 2012, Plaintiffs obtained a position through which he worked for the Village of Los Ranchos in addition to BCSO. [Defs' SMF ¶ 2; Pltfs' Response, ¶ 2] From December 2013 through February 2014, Plaintiff

submitted overtime requests in advance to Chief Deputy Katz for his approval. [Defs' SMF, ¶ 3; Pltf's Response, ¶ 3] Plaintiff asserts, and Defendants do not dispute, that after Chief Deputy Katz retired, Plaintiff submitted his timesheets to Wendy Jiacoletti, who said she would obtain approval signatures. [Pltf's Response, ¶ 3]

## A. Campaign Contributions and the 2014 Election

2014 was an election year for the position of Sheriff of Bernalillo County. [Defs SMF, ¶ 5; Pltf's Response, ¶ 5] Plaintiff was a supporter of then incumbent Sheriff Dan Houston: he worked on Houston's campaign putting up signs and donated $250 to Houston's campaign. [Depo of M. McCoy, p.63, l.6 through p.64, l.18; Defs' SMF, ¶ 6; Pltf's Response, ¶ 6] Following Houston's loss in the primary election in June of 2014, Plaintiff became a supporter of candidate Scott Baird but did not actively work on his campaign. He donated $100 in the form of an advertisement. [Depo of M. McCoy, Doc. 59-1, 64:l-25 to 66:l-3; Defs' SMF, ¶ 7; Pltf's Response, ¶ 7] The donation was reported in a Campaign Finance Report on the New Mexico Secretary of State's website on October 14, 2014. [Pltf's Response, ¶ 12; Defs' Reply, ¶ 5]

Scott Baird was defeated by Defendant Manuel Gonzales, III. [Defs' SMF ¶ 21; Pltf's Response, ¶ 21] Defendant Mora became Undersheriff after Defendant Gonzales took office in January 2015. [Defs' SMF, ¶ 21; Pltf's Response, ¶ 21]

## B. Incidents Leading to an Internal Affairs Investigation of Plaintiff

In August 2014, Plaintiff was working security for an event at the Journal Pavilion. [Defs' SMF, ¶ 9; Pltf's Response, ¶ 9] He was driving an unmarked "black Charger." [*Id.*] On the way home, BCSO deputies saw the vehicle and followed him.

When Plaintiff learned through a call from another officer that he was being pursued, he turned on the emergency lights and pulled over. [*Id.*] The two officers drove by and did not make contact with him. [*Id.*] Later that evening, the BCSO officers went to Plaintiffs' house, but Plaintiff declined to speak with them and instead wanted to speak to the Lieutenant or Sergeant on duty. [*Id.*] He eventually spoke to the acting Sergeant on duty, Sergeant Primazon.[1] The deputies reported during the IA investigation that they had observed the black Charger going over 100 MPH and nearly hitting a curb. [Defs' Exh B; Defs' SMF, ¶ 9] Plaintiff disputes that he was speeding or driving erratically. [Pltf's Response, ¶ 9]

Defendant Houston was informed of the August, 2014 incident two months later on October 31, 2014 (i.e., seventeen days after the Campaign Finance Report reflecting Plaintiff's donation to Scott Baird was made public). [Defs' SMF, ¶ 10; Pltf's Response, ¶ 10] In the course of considering the August incident, Defendant Houston inquired into Plaintiff's supervisors and time cards. [Defs' SMF, ¶ 12; Pltf's Response, ¶ 12 (not disputing this fact)] In so doing, Houston discovered that the signatures on some of Plaintiff's time cards were not authentic. [Defs' SMF, ¶ 13-14; Pltf's Response, ¶ 13-14] Defendant Houston ordered an IA investigation into both the August incident and "questionable time card submissions by [P]laintiff." [Defs' SMF, ¶ 15; Pltf's Response, ¶ 15]

## C. The Internal Affairs Investigation, Criminal Investigation, and Submission of the LEA 90

---

[1] Also spelled "Priemason" by Defendants. [Defs' SMF, ¶ 9]

Defendant Golden issued a "target letter" to Plaintiff the same day the IA investigation was ordered by Defendant Houston (October 31, 2014) and began investigating the allegations. [Defs' SMF, ¶ 16; Pltf's Response, ¶ 16] In April 2015, the BCSO White Collar Crimes Unit also opened an investigation. [Defs' SMF, ¶ 17; Pltf's Response, ¶ 17] In February, 2016, Defendant Mora submitted an "LEA 90," a form used to report alleged misconduct, was submitted to the Law Enforcement Academy. [Defs' SMF, ¶ 18; Doc. 59-6, Mora Depo, 55:20-56:21; Doc. 62-3, 55:2 – 556:1]

## D. Investigations of Other Officers

Finally, the parties do not dispute that some BCSO supervisors were investigated for allegations of time card fraud in 2010, that both IA and criminal investigations were conducted, and that the criminal investigation was referred to the District Attorney. [Defs' SMF, ¶¶ 11; Pltf's Response, ¶¶ 11] In addition, they do not dispute that another deputy was investigated in 2016 for being untruthful with regard to time reporting, among other things. Both IA and criminal investigations were conducted. [Defs' SMF, ¶ 25; Pltf's Response, ¶ 25] The criminal investigation was referred to the District Attorney for review, and an LEA 90 was submitted. [*Id.*]

Additional facts are included in the Court's discussion of the parties' arguments.

## II. Discussion

### A. Summary Judgment and 12(b)(6) Standards

Defendants move for summary judgment on some claims and request dismissal of other claims for failure to state a claim under Rule 12(b)(6). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this Rule, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Generally, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks and citation omitted). If the responding party fails to properly address the movant's assertion of fact as required by Rule 56(c), a district court may "grant summary judgment if the motion and supporting materials—including the facts

considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Upon a motion for summary judgment, a district court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997).

The Court's review under Fed. R. Civ. P. 12(b)(6) focuses on the sufficiency of the complaint. Federal Rule of Civil Procedure 8(a)(2) requires a complaint to set out "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), the Supreme Court held that "to withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 570). In applying this test, a court accepts as true all "plausible, non-conclusory, and non-speculative" facts alleged in the plaintiff's complaint, *Shrader v. Biddinger*, 633 F.3d 1235, 1242 (10th Cir. 2011), but does not accept as true any legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). In short, in ruling on a Rule 12(b)(6) motion, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Collins*, 656 F.3d at 1214.

## B. Count I

In Count I, Plaintiff alleges "42 U.S.C. § 1983 Constitutional Deprivations Under the First and Fourteenth Amendments against Defendants Houston, Gonzales, Mora, and Golden for Retaliation for Lawful Speech and Political Activity." [Complaint, pg. 9] Defendants argue that they are entitled to summary judgment 1) to the extent the claim is improperly based on the Fourteenth Amendment; 2) because Plaintiff cannot show that his political speech was a substantial factor in their decision to take adverse employment actions against him; and 3) because they are entitled to qualified immunity. [Doc. 59] The Court will address these arguments in turn.

### 1. Whether Freedom of Speech Claims Must be Analyzed under the First, not Fourteenth, Amendment

Defendants move to dismiss Count I as a matter of law to the extent it is based on violation of the Fourteenth Amendment. [Doc. 59, pg. 9] *See* Fed. R. Civ. P. 12(b)(6) (stating that "a party may assert the . . . defense[ of] . . . failure to state a claim upon which relief can be granted"). Plaintiff did not respond to this argument in his *Response*. [Doc. 62] Neither does Plaintiff explain in the *Complaint* how the Fourteenth Amendment provides a cause of action for retaliation based on protected speech that is independent of the First Amendment. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) (stating that "[t]he first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed.").

The Court agrees with Defendants that, to the extent that Plaintiff asserts a claim under the Fourteenth Amendment based on retaliation for his political activity, that claim

is coextensive with his First Amendment claim and, therefore, must be dismissed. *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984) ("A complaint may be dismissed as a matter of law for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim."). Under *Albright*, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright*, 510 U.S. at 273 (internal quotation marks and citation omitted); *see Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 46 (1st Cir. 1992) (stating that "[t]o the extent [a] substantive due process claim is based on the alleged retaliation for [the plaintiff's] political views, it is coextensive with his First Amendment claim"). Any claim based on the Fourteenth Amendment will be dismissed.

## 2. The First Amendment Claim and the *Garcetti/Pickering* Analysis

Defendants next argue that Count I must be dismissed because Plaintiff's protected speech was not a substantial factor in any adverse action against him, or, if it was, Defendants would have taken those actions even in the absence of such speech. [Doc. 59, pg. 9-15] Analysis of First Amendment claims by public employees invokes five steps known as "the *Garcetti/Pickering* analysis." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007). Those are:

> First, the court must determine whether the employee speaks pursuant to his official duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech

simply reflects the exercise of employer control over what the employer itself has commissioned or created.

Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends.

Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer.

Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision.

Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

*Id.* at 1202-03 (internal quotation marks and citations omitted; spacing added for clarity); *see Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005) (setting out the test and stating that "[t]he employee also bears the burden under the [fourth] factor of establishing an adverse employment action."). "The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact." *Brammer*, 492 F.3d at 1202-03.

For purposes of the present *Motion*, Defendants do not argue that Plaintiff's political speech was part of his employment, and do not dispute that the political activity in question was a matter of public concern or that Plaintiff's interest in engaging in such activity outweighed Defendants' interest in "an efficient and effective workplace." [Doc. 59, pg. 10] Instead they argue that Plaintiff cannot demonstrate that Plaintiff's political activity was a substantial factor in the Defendants' employment actions (Factor Four).

[*Id.*] Defendants also assert that they have shown that they would have taken the same actions even in the absence of Plaintiff's political activity (Factor Five). [Doc. 59, pg. 14-15]

The Court finds that the first three *Garcetti/Pickering* factors are clearly met. Plaintiff made a donation to the Baird campaign as a private citizen. *See Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010) (stating that "[t]he guiding principle [as to this factor] is that speech is made pursuant to official duties if it involves the type of activities that [the employee] was paid to do." (internal quotation marks and citation omitted)). In addition, "[c]ourts have held that political speech regarding a public election is undoubtedly a matter of public concern." *Brammer-Hoelter*, 492 F.3d at 1205. Finally, Plaintiff's interest in speaking on political candidates outweighs the BCSO's interest. "The citizenry's ability to make known their assessment of a candidate's qualifications for public office is 'integral to the operation of the system of government established by our Constitution.'" *Bass v. Richards*, 308 F.3d 1081, 1089 (10th Cir. 2002) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)). "Accordingly, the First Amendment affords the *broadest* protection to such political expression." *Id.* (internal quotation marks and citation omitted). Moreover, "the *employer* bears the burden of justifying its regulation of the employee's speech" and, since Defendants here make no argument regarding their interest as employers, the Court "must assume that Plaintiffs' interests in speaking on the four remaining matters outweighed Defendants' interests in managing the work environment." *Brammer-Hoelter*, 492 F.3d at 1207.

Under the fourth *Garcetti/Pickering* factor, "the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision." *Brammer-Hoelter*, 492 F.3d at 1202. Hence, the first step is to determine whether Plaintiff has alleged a "detrimental employment decision" by Defendants.

"Actions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment." *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1437 n.3 (10th Cir. 1990) (stating that the Tenth Circuit has rejected the position that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected conduct are illegal"). However, "employers may have a justifiable right to investigate allegations of misconduct, and such investigations do not automatically constitute detrimental employment decisions." *Miller v. Kennard*, 74 F. Supp. 2d 1050, 1060–61 (D. Utah 1999). Here, Plaintiff argues that initiation of the IA investigation was itself baseless, and, more significantly, led to both an unfounded criminal investigation that was referred to the District Attorney's office and could have resulted in criminal charges, as well as an unfounded report to the Law Enforcement Academy Board, which could have ended in revocation of his certification. Viewed in the light most favorable to Plaintiff, the Court concludes that a fact-finder could find the IA investigation, initiation of a criminal investigation, and report to the LEA to be detrimental employment decisions. *Cf. Bass*, 308 F.3d at 1088 (stating that "the government infringes upon protected activity whenever it punishes or threatens to punish protected speech"); *Miller*, 74 F.Supp.2d at 1060 (stating that, where the plaintiff "offered evidence suggesting that [the] investigation of him was excessive, unusual,

disproportionate to the allegations, and conducted in violation of Sheriff's Office policies," the investigation could be a detrimental employment decision).

Next, the Court examines whether Plaintiff can make a causal connection between his speech and Defendants' actions. Defendants argue that Plaintiff cannot show that his support of Baird was a substantial factor in initiation of the IA investigation, initiation of the criminal investigation, or submission of the LEA 90. [Doc. 59] "Adverse action in close [temporal] proximity to protected speech may warrant an inference of retaliatory motive." *Maestas*, 416 F.3d at 1189. While "temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision, . . . [a]n employer's knowledge of the protected speech, together with *close* temporal proximity between the speech and challenged action may be sufficiently probative of causation to withstand summary judgment." *Id.* (citations omitted). In addition, "[o]ther evidence of causation may include evidence the employer expressed opposition to the employee's speech or evidence the speech implicated the employer in serious misconduct or wrongdoing." *Id.* (citations omitted). "On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link." *Id.* (citations omitted). These principles rest on a basic premise: "Before Plaintiff can show that his speech was a substantial or motivating factor in the decision to [take adverse actions against him], he must at the very least establish that Defendants knew of the speech." *Ellison v. Roosevelt Cty. Bd. of Cty.*

*Commissioners*, No. CV 16-415 GBW/GJF, 2016 WL 9818330, at *10 (D.N.M. Nov. 17, 2016) (citing *Hook v. Regents of Univ. of Cal.*, 394 Fed.Appx. 522, 539 (10th Cir. 2010).

The Court will examine whether Plaintiff has adduced facts raising a question of fact as to whether his protected speech was a substantial factor in decisions made by each defendant, starting with Defendant Mora.

As to Defendant Mora, Defendants assert that "Mora came on as Undersheriff [after January 1, 2015]" that "Plaintiff's sole basis for his claim that Rudy Mora retaliated against him is that Mora submitted the LEA 90," and that "Plaintiff cannot establish that his support of Baird in the election was a substantial factor driving Mora's submission of the LEA 90." [Defs' SMF, ¶ 21; Doc. 59, pg. 13] Plaintiff generally disputes this assertion, and states that "Defendant Mora knew or should have known that the allegations against Plaintiff were unfounded yet proceeded with the criminal and LEA referrals." [Pltf's Response, ¶ 21] Plaintiff fails to demonstrate a question of fact as to whether his political speech was a substantial factor in Mora's decision to submit the LEA 90. First, Plaintiff's statement that Mora "knew or should have known that the allegations . . . were unfounded" does not address whether Mora retaliated against Plaintiff based on Plaintiff's speech. Moreover, evidence submitted by Plaintiff indicates that Mora did not know that Plaintiff had contributed to Baird's campaign, a fact essential to Plaintiff's First Amendment claim. Mora testified as follows:

> Q: At any point in time, were you aware – did you ever become aware that Mr. McCoy supported Scott Baird in the primary election against Sheriff Houston?
>
> . . .

A: I have no idea who he supported.

. . .

Q: So you were never aware that – that Mr. McCoy was supporting Scott Baird in any way?

A: No.

. . .

Q: Okay. Did you ever become aware of an ad that [Plaintiff] placed in the "Village Voice" newspaper I think supporting Scott Baird?

A: No.

Q: All right. Did you see any publications that were released that indicated that [Plaintiff] contributed money to Scott Baird?

A: No.

[Doc. 62-3, Mora Depo, 51:1:12 -- 52:3-24] Moreover, Plaintiff does not dispute that the LEA 90 was submitted pursuant to regulation and that it was filed in February 2016, approximately sixteen months after the Campaign Finance Report was published and over a year after the election. Hence, Plaintiff adduces no evidence that 1) the LEA 90 was submitted in close temporal proximity to the political speech, 2) that Mora knew of Plaintiff's political speech, or 3) any other evidence demonstrating a connection between the political speech and Mora's conduct. In the absence of such evidence, Plaintiff fails to raise a question of material fact over whether his political speech was a substantial factor in Defendant Mora's decision to submit the LEA 90. Summary judgment will, therefore, be granted as to Defendant Mora as to Plaintiff's First Amendment claim.

As to Defendant Gonzales, Defendants assert that "Plaintiff's sole basis for his claim of retaliation by Sheriff Gonzales is that [P]laintiff was a Baird supporter." [Defs'

SMF, ¶ 22] Plaintiff "disputes Defendants' representations," and argues that "[i]t is undisputed that Gonzales was Sheriff at the time the criminal investigation was opened and submitted to the District Attorney's Office" and "when the LEA[]90 was submitted." [Pltf's Response, ¶ 22]

Even viewing these facts in Plaintiff's favor, the mere fact that Gonzales was Sheriff at the time these actions were taken does not support an inference that they were taken in retaliation for Plaintiff's political speech. Moreover, Plaintiff does not direct the Court to any evidence indicating that Gonzales knew that Plaintiff was a Baird supporter. In fact, Plaintiff testified that he did not have any evidence that Defendant Gonzales knew of Plaintiff's contribution to Baird, or that Gonzales expressed retaliatory intent related to Baird supporters:

> Q: Okay. And how about Sheriff Gonzales? What basis did he have to retaliate against you?
>
> A: The same reason [i.e., because Plaintiff had supported Scott Baird].
>
> Q: Okay. How would he know you were a Scott Baird supporter?
>
> A: It's public record.
>
> Q: From that one campaign contribution?
>
> A: Correct.
>
> Q: Okay. So you believe Sheriff Gonzales saw that. Do you have any basis for thinking Sheriff Gonzales read that secretary of state report?
>
> A: No.
>
> Q: Secretary – or Sheriff Gonzales never talked to you about that secretary of state report?
>
> A: No.

Q: Sheriff Gonzales never talked to you about Scott Baird?

A: No.

Q: Sheriff Gonzales never said – you never heard him say anything like you claim Houston said, "I'm out to get anybody who supports Scott Baird," correct?

A: No. Correct.

Q: Okay. So what basis do you have for thinking Sheriff Gonzales would retaliate against you?

A: The same reason.

[Doc. 59-1, McCoy Depo, 96:3-98:22] Plaintiff's belief that Gonzales knew he was a Baird supporter based on his belief that Gonzales had seen the Campaign Finance Report pertaining to Baird's campaign is speculative. "Testimony which is grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004) (stating that the plaintiff's "speculative statements about [the defendants'] motives for terminating her employment . . . [did] not suffice to create a *genuine* issue of material fact as to the causal connection between her potential filing for workers' compensation and her termination").

Finally, the criminal investigation was opened roughly three months after Gonzales took office (after the IA investigation had been going for five months), and the LEA 90 was submitted over a year after he took office. The Court finds that Plaintiff has failed to adduce evidence showing either knowledge or temporal proximity and, hence, has failed to demonstrate a genuine issue for trial as to whether his political speech was a

substantial factor in Gonzales' conduct. Summary judgment will be granted as to Plaintiff's First Amendment claim against Defendant Gonzales.

Next, Defendants assert that "Plaintiff's sole basis for this lawsuit against Lt. Golden is that Golden sent [P]laintiff the IA target letter" and that there is no evidence indicating that Golden acted due to Plaintiff's political contribution to Baird. [Defs' SMF, ¶ 20] Plaintiff responds with the statement that "Defendant Golden . . . knew that there was no sound basis for the charges being pursued against Plaintiff." [Pltf's Response, ¶ 20] This assertion, and the evidence adduced to support it, does not address the crux of the First Amendment claim: that Golden acted *in substantial part because of* Plaintiff's political speech. *See Brammer-Hoelter*, 492 F.3d at 1202-03 (stating that "the employee must show that his speech was a substantial factor or a motivating factor" in the adverse action against him). First, it is undisputed that Defendant Houston ordered Golden to initiate the IA investigation. Second, as discussed further, *supra*, Golden testified that after reviewing the time sheets and other evidence collected during the IA investigation, he alerted the new Sheriff (Gonzales) that the matter had potentially criminal elements. His testimony suggests that Gonzales, or Chief Rees, who is not named as a defendant, decided to open a criminal investigation. [Golden Depo, Doc. 59-5, 43:5-10, 44:1-10, 11:19-23; 44:18-45:6] As already discussed, Plaintiff adduces no evidence that his political speech was a factor in Gonzales's conduct. Finally, Plaintiff does not dispute that such investigations are consistent with BCSO practice to conduct criminal investigations on "any IA investigations which appear to have possible criminal elements." [Defs' SMF, ¶ 17; Pltf's Response, ¶ 17] Hence, Plaintiff has failed to meet

his burden to demonstrate a genuine issue for trial as to whether Golden acted based on Plaintiff's political speech and Plaintiff's First Amendment claim against Defendant Golden will be dismissed.

The Court next turns to Defendant Houston. The following facts as to Houston are undisputed:

1. In 2014, Plaintiff was a supporter of Defendant Houston, who was the incumbent sheriff running in a primary election against Scott Baird [Depo of M. McCoy, p.63, l.6 through p.64, l.18; Defs' SMF, ¶ 6; Pltf's Response, ¶ 6];

2. Defendant Houston lost in the primary to Baird [Depo of M. McCoy, p.64, l.25 through p.66, l.3; Defs' SMF, ¶ 7; Pltf's Response, ¶ 7];

3. Plaintiff supported the Baird campaign in the 2014 election against Defendant Gonzales by paying for an advertisement [Depo of M. McCoy, p.64, l.25 through p.66, l.3; Defs' SMF, ¶ 7; Pltf's Response, ¶ 7];

4. Defendant Houston told Plaintiff that Houston would retaliate against Baird supporters. [McCoy Depo, Doc. 62-1, 80:7-83:2; Pltf's Response, ¶ 8; Defs' Reply, ¶ 8 (not disputing this fact)]

5. A Campaign Finance Report showing that Plaintiff had supported Baird against Defendant Gonzales was released on October 14, 2014 [Pltf's Response, ¶ 12; Defs' Reply, ¶ 5];

6. Defendant Houston knew that Plaintiff had supported Baird [Houston Depo, Doc. 62-5, 78:23-79:13]

7. Defendant Houston ordered an IA investigation on October 31, 2014 [Defs' SMF, ¶ 15; Pltf's Response, ¶ 15];

These undisputed facts establish that Houston knew of the protected speech, there was close temporal proximity between publication of a record of the protected speech and initiation of the IA investigation, and Houston expressed animosity toward Baird supporters. Hence, these facts are sufficient to survive the test as to whether Plaintiff's speech was a substantial factor in Houston's decision to order an IA investigation. *See Maestas*, 416 F.3d at 1189.

As noted above, once a plaintiff demonstrates the existence of evidence supporting a causal link between protected speech and an adverse action, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Brammer-Hoelter*, 492 F.3d at 1202-03. Here, Defendants argue that Houston would have initiated the IA investigation even in the absence of the protected speech, and point to the following facts:

1. Defendant Houston initiated an IA investigation of BCSO supervisors accused of falsifying time cards in 2010. [Defs' SMF, ¶ 11; Pltf's Response, ¶ 11] A criminal investigation was opened and referred to the District Attorney's office for review. [*Id.*] Ultimately, the District Attorney's office declined to prosecute. [*Id.*]

2. In 2016, another deputy was investigated for being untruthful with regard to time reporting, among other things. Both IA and criminal investigations were conducted and the criminal investigation was referred to the District Attorney's

office for review. An LEA 90 was submitted. [Defs' SMF, ¶ 25; Pltf's Response, ¶ 25 (admitting these facts)]

Plaintiff, while not disputing the stated facts regarding the 2010 investigation, argues that the officer investigated in 2016 is "not a fair comparator to Plaintiff because that individual was investigated for multiple serious issues, and time cards were only a part of the investigation." [Pltf's Response, ¶ 25; see Mora Depo, Doc. 62-3, 23:5-24:7] He asserts that the officer was investigated for failing to tag or otherwise preserve evidence and claiming overtime while working out at a gym. [Pltf's Response, ¶ 25; Defs' Reply, ¶ 18] Plaintiff relies on Defendant Mora testimony that the officer was investigated for "multiple policy violations" and agreed that "time card issues weren't his only problem." [Mora Depo, Doc. 62-3, 23:5-24:7]

The Court concludes that Defendants have not established that Defendant Houston would have initiated the IA investigation in the absence of Plaintiff's political speech. See Baca v. Sklar, 398 F.3d 1210, 1222 (10th Cir. 2005) (stating that once a plaintiff demonstrates that protected speech was a substantial factor, "[t]he burden then shifts to the employer to show by a preponderance of the evidence that it would have reached the same decision regardless of the employee's [speech]"). First, they point to only two IA investigations initiated by BCSO involving time cards in approximately six years, in spite of testimony by Defendant Mora that the time reporting system "d[id] give the ability— the way people were doing things, they could easily take advantage of the system." [Mora Depo, Doc. 62-3, 51:4-6] Second, only the 2010 investigation was initiated while Defendant Houston was in office, and, consequently, only that investigation is

representative of Houston's conduct. Houston testified that the 2010 investigation was initiated after allegations by a local reporter who alleged that "deputies were drawing overtime . . . and were [instead] at home and not doing [their work]." [Houston Depo, Doc. 62-5, 49:21-23; Defs' SMF ¶ 11] Although Defendants want the Court to infer from the facts about the 2010 investigation that time cards were closely scrutinized after the 2010 incident and that Plaintiff was investigated pursuant to this heightened scrutiny, the Court could also infer from these facts that Houston initiated the 2010 investigation only in response to public pressure. Because "all inferences arising from the record before us must be drawn and indulged in favor of the party opposing summary judgment," the Court could infer further that IA investigations of time card irregularities were not routinely ordered by Defendant Houston. *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 921 (10th Cir. 2001). Hence, although the facts asserted by Defendants—i.e., that there was an investigation of time card fraud in 2010—are undisputed, the inferences to be drawn from those facts must be resolved by the jury.

The Court concludes that Plaintiff has met his burden to adduce evidence showing that his political activity was a "substantial factor" in Defendant Houston's decision to order an IA investigation, and that Defendant Houston failed to show that he would have done so even in the absence of such activity.

### 3. Whether Defendant Houston is entitled to Qualified Immunity

Defendants argue that they are entitled to qualified immunity because Plaintiff cannot show that they violated his constitutional First Amendment right and that the law governing such rights was clearly established at the time. [Doc. 59, pg. 17] The doctrine

of qualified immunity shields government officials performing discretionary functions from suit and liability for civil damages "unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004). To prevail against a motion for summary judgment based on qualified immunity, the plaintiff must show "(1) at least a genuine issue of material fact as to whether the individual defendants violated his [Constitutional right], and (2) this right was clearly established at the time." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). A plaintiff ordinarily demonstrates that a law is clearly established by showing a Supreme Court or Tenth Circuit decision on point, or that the clearly established weight of authority from other courts has determined the law to be as the plaintiff maintains. *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). Only if the plaintiff satisfies both elements does the defendant bear the normal burden of the summary judgment movant of "showing that no material factual issues remain to defeat his claim of qualified immunity." *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1026 (10th Cir. 1994) (internal quotation marks and citation omitted).

Because Plaintiff has not demonstrated that his political activity was a substantial factor in conduct by Defendants Gonzales, Mora, and Golden, summary judgment will be granted as to his First Amendment claim against those defendants. Hence, there is no need to address qualified immunity as to them.

However, Plaintiff has adduced evidence showing that Defendant Houston based his decision to order an IA investigation in part on Plaintiff's protected activity. Hence,

the only qualified immunity question is whether it would have been clear to a reasonable officer in October 2014 that initiation of an IA investigation in retaliation for protected speech was illegal. *See Dill v. City of Edmond, Okl.*, 155 F.3d 1193, 1205 (10th Cir. 1998) (stating that the question was whether, "when [the d]efendants transferred [the p]laintiff, the law was clearly established so that [the d]efendants should have realized that their actions would violate the First Amendment"). In *Dill*, our Tenth Circuit held that the defendants were not entitled to qualified immunity where they "should have known that it would be unconstitutional to transfer [the p]laintiff from detective to patrol officer and to alter his weekend duty schedule in retaliation for [the p]laintiff's speech." *Id*. It relied on *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990), stating that "[a]t issue in *Rutan* was whether promotions, transfers, recalls from layoffs, and hiring decisions involving public employees could be constitutionally based on political party affiliation and support" and concluded that the United States Supreme Court had made "clear that there are 'deprivations less harsh than dismissal that nevertheless' violate a public employee[']s rights under the First Amendment." *Id*. (quoting *Rutan*, 497 U.S. at 75); *see Miller*, 74 F. Supp. 2d at 1062 (stating that "it was clearly established in September 1997 that [detrimental, retaliatory employment actions]" motivated by protected speech "were in violation of the First Amendment"). The Court concludes that it was clearly established in October 2014 that an IA investigation could constitute a detrimental employment action and that ordering such an investigation in retaliation for political activity was a violation of the First Amendment. Defendant Houston is not entitled to qualified immunity at this time.

## C. Count II

In Count II, Plaintiff alleges that Defendants violated the New Mexico Tort Claims Act (NMTCA)[2] when they "maliciously initiated judicial or similar proceedings, slandered, libeled, defamed, and committed other torts against Plaintiff." [Complaint, pg. 12] Defendants argue that Defendant Bernalillo County is entitled to summary judgment because Plaintiff failed to comply with the notice requirement of the New Mexico Tort Claims Act. They also argue that Plaintiff cannot establish evidence of each of the elements of a malicious abuse of process claim, or the elements of a defamation claim. Defendants also argue that Plaintiff has failed to state a claim as to his negligent hiring, supervision, training, discipline, and retention claim, and, moreover, that Defendant Bernalillo County cannot be liable for such a claim in the absence of a constitutional violation. [Doc. 59]

### 1. Whether Plaintiff Failed to Comply with the Notice Requirement of the New Mexico Tort Claims Act

Plaintiff does not dispute that he failed to provide notice to Defendant Bernalillo County as required by the NMTCA, NMSA 1978, § 41-4-16. [Doc. 59, pg. 19 (noting that notice is required for governmental entities but not individual defendants); Doc. 59-

---

[2] "As to torts committed by law enforcement officers, the NMTCA waives immunity in the following circumstances: 'for . . . malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.'" *Gilpin v. Bd. of Cty. Commissioners of Roosevelt Cty.*, No. CV 11-336 LH/LAM, 2012 WL 13076332, at *2–3 (D.N.M. Oct. 3, 2012) (quoting NMSA 1978, § 41-4-12).

14; Doc. 62, pg. 19 (stating that "Plaintiff's claims against the individual [d]efendants are viable" because "there is no requirement for [p]laintiffs to submit a tort claims notice to sue individuals")] Section 41-4-16(A) provides that

> Every person who claims damages from the state or any local public body under the Tort Claims Act shall cause to be presented to . . . the county clerk of a county for claims against the county, or to the administrative head of any other local public body for claims against such local public body, within ninety days after an occurrence giving rise to a claim for which immunity has been waived under the Tort Claims Act, a written notice stating the time, place and circumstances of the loss or injury.

"The written notice requirements of Section 41–4–16 do not apply to claims against public employees." *Dutton v. McKinley Cty. Bd. of Comm'rs*, 1991-NMCA-130, ¶ 12, 822 P.2d 1134. The Court finds that, based on the undisputed fact that Plaintiff did not serve notice under § 41-4-16(A) to Defendant Bernalillo County, the NMTCA claims against Bernalillo County must be dismissed. *See Ricks v. New Mexico Adult Prob. & Parole Dep't*, No. CV 11-608 LH/LFG, 2012 WL 13076308, at *11 (D.N.M. Aug. 9, 2012) (dismissing claims against a governmental entity for lack of notice under the NMTCA).

## 2. Whether Plaintiff can Establish the Elements of Malicious Abuse of Process Against Defendants Houston, Gonzales, Mora, and Golden

In the *Complaint*, Plaintiff alleges that

> 52. Defendants Houston, Gonzales, Mora, [and] Golden . . . maliciously instituted judicial or similar proceedings, . . . by, among other things, attempting to have him investigated by federal authorities and others, and by seeking to have the Law Enforcement Academy Board remove Plaintiff's law enforcement certification.

> . . .

54. Defendants knew that there was no probable cause to support the allegations they perpetuated against Plaintiff. They initiated the allegations and then went to great lengths to pursue them for an improper motive – namely to punish Plaintiff for his political activity.

[Doc. 1-1] In his *Response*, Plaintiff does not discuss the alleged attempt to involve the federal authorities, instead alleging that Defendants improperly 1) opened a criminal investigation and 2) referred the investigation to the District Attorney. [Doc. 62]

The New Mexico Supreme Court defined the tort of malicious abuse of process as "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham v. Guest*, 2009-NMSC-007, ¶ 29, 204 P.3d 19. A "judicial proceeding" is "a criminal prosecution, a civil lawsuit, or an arbitration proceeding." NMRA, Rule 13-1637. "An improper use of process may be shown by (1) filing a complaint without probable cause, or (2) 'an irregularity or impropriety suggesting extortion, delay, or harassment[,]' or other conduct formerly actionable under the tort of abuse of process." *Durham*, 2009-NMSC-007, ¶ 29 (quoting *Fleetwood Retail Corp. of N.M.*, 2007–NMSC–047, ¶ 12, 164 P.3d 31). "A use of process is deemed to be irregular or improper if it (1) involves a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) indicates the wrongful use of proceedings, such as an extortion attempt." *Durham*, 2009-NMSC-007, ¶ 29. "[T]he tort of malicious abuse of process should be construed narrowly in order to protect the right of access to the courts." *Id.*

As a preliminary matter, the Court notes that the parties agree that Defendant Houston was no longer sheriff when the criminal investigation was opened in April 2015. [Defs' SMF ¶ 21; Pltf's Response, ¶ 21]  Hence, any malicious abuse of process claim based on instigation of the criminal investigation and subsequent conduct cannot apply to Houston.  Summary judgment will therefore be granted as to Plaintiff's malicious abuse of process claim against Defendant Houston.

Defendants argue that there is no evidence of an abuse of judicial processes because they merely provided information to the District Attorney's office, which determined independently whether to prosecute or not.  [Doc. 59]  *See Zamora v. Creamland Dairies, Inc.*, 1987-NMCA-144, ¶¶ 21, 26-32, 747 P.2d 923 (discussing whether provision of information to the district attorney and police by a private citizen could be malicious abuse of process and stating that "[i]f a private person gives a prosecutor information he believes to be true, and the officer, in the exercise of his uncontrolled discretion, initiates proceedings based on that information, the informer is not liable").  Plaintiff argues that *Zamora* is distinguishable because it dealt with private citizen informants, and counters that "the initiation of a criminal investigation and referral to the District Attorney's office to prosecute satisfies the first element [of abuse of process] when the Defendant is a law enforcement agency or officer." [Doc. 62]  He points to *Weststar Mortgage Corporation v. Jackson*, 2003-NMSC-002, ¶ 11, 61 P.3d 823, in which the New Mexico Supreme Court stated that "the defendant can be regarded as an instigator of the proceeding only if" he or she makes false or inaccurate statements upon which the prosecutor relies or uses his or her "power or position to influence the

prosecutor in favor of prosecution." (internal quotation marks and citation omitted). Plaintiff argues that Defendants, as "Bernalillo County Sheriff's Office senior officials, used their 'power or position to influence the prosecutor in favor of prosecution.'" [Doc. 62] However, Plaintiff provides no evidence that Defendants took any action to persuade the District Attorney's office to prosecute once the investigation was referred.[3] Hence, he fails to create a dispute of fact over whether Defendants did more than merely forward information to the District Attorney. Moreover, it is undisputed that the District Attorney declined to pursue the matter or prosecute Plaintiff. [Defs' Reply, ¶ 11; Doc. 62-8]

Next, Plaintiff argues that Defendants acted improperly because they knew that the allegations were unfounded after the IA investigation, yet pursued a criminal investigation and forwarded the matter to the District Attorney anyway. He alleges that Defendant Gonzales, Golden, and Mora "had the benefit of all of the information [that the district attorney's office later found exculpatory], yet they proceeded not only with the criminal investigation, but with a report to the Law Enforcement Academy Board to attempt to have Plaintiff's Law Enforcement Certification revoked or suspended." [Doc. 62, ¶¶ 17, 18] *Cf. Durham*, 2009-NMSC-007, ¶ 29 ("An improper use of process may be shown by (1) filing a complaint without probable cause . . . ."). Defendants reply that "[i]t is undisputed that it was actually investigating agent Brian Lobato, rather than any of the Defendants as claimed by Plaintiff, who submitted the case for consideration [by the

---

[3] Similarly, Plaintiff does not dispute that the white collar crimes detectives contacted the Secret Service and provides no evidence that any of the Defendants directed them to do so or were otherwise involved in that conduct. [Defs' SMF, ¶ 17; Pltf's Response, ¶ 17 (not disputing this assertion); Golden Depo, Doc. 59-5, 53:1-7]

District Attorney]" and that the LEA 90 was submitted consistent with BCSO policy. [Doc. 65, pg. 10]

The Court agrees that Plaintiff has not adduced evidence raising a genuine issue of fact to be resolved at trial. Defendant Golden testified that

> [e]very time there's an internal affairs investigation that is started, and criminal wrongdoing appears to be there as well, typically that's brought to the attention of the sheriff and then they make the determination of whether or not to pursue the criminal charges or not.
>
> . . .
>
> [I]n internal affairs we have the obligation to let the sheriff know, hey, this has criminal undertones to it, we need to pause the investigation. In my experience it's, okay, get ahold of somebody from CID. And he usually gets ahold of someone, the chief deputy, over criminal investigations, . . . and says, "internal affairs needs to get a criminal investigation started, who do they need to go talk to?"

[Golden Depo, Doc. 59-5, 43:5-10, 44:1-10] Golden further testified that "once [he] had all of the time cards and overtime slips, and in talking with . . . [some witnesses], is when it was like, okay, there's something else here. You know, some of these signatures aren't right." [Golden Depo, Doc. 59-5, 44:19-23] He stated, "that was when it was taken to white collar crimes," and that the white collar crimes detectives were "summoned up to the 5th floor and we met in Chief Rees' office," although he did not "know how they were contacted or selected for the assignment." [Golden Depo, Doc. 59-5, 44:18-45:6] Plaintiff does not dispute that initiation of a criminal investigation is consistent with BCSO practice to conduct criminal investigations on "any IA investigations which appear to have possible criminal elements." [Defs' SMF, ¶ 17; Pltf's Response, ¶ 17]

Defendant Golden testified that, during the internal affairs investigation, he spoke to witnesses who told him that Plaintiff's overtime claims "had some basis in reality," that the policy for approval of overtime claims by the Village of Los Ranchos was not strictly enforced, that BCSO policies for approval of overtime were not strictly enforced, and that Plaintiff in fact did attend some meetings for which he claimed overtime. [Golden Depo, Doc. 62-2, 67:5 – 72:2] Golden also stated that he learned that another BCSO employee had admitted signing a supervisor's name on Plaintiff's time cards on some occasions, and to occasionally processing unsigned time cards for Plaintiff. [Golden Depo, Doc. 62-2, 70:2-6] The District Attorney relied on these facts to conclude that it would not prosecute Plaintiff. [Doc. 62-8]

"Probable cause in the malicious abuse of process context is defined as a reasonable belief, founded on known facts established after a reasonable pre-filing investigation that a claim can be established to the satisfaction of a court or jury." *Fleetwood Retail Corp. of N.M.*, 2007-NMSC-047, ¶ 13 (internal quotation marks and citation omitted). Viewing the evidence in the light most favorable to Plaintiff, the evidence obtained in the IA investigation may have obviated probable cause. Nevertheless, Plaintiff has cited no cases, and the Court has found none, holding that, in the context of a malicious abuse of process claim, probable cause is required to open an investigation in the first instance. Indeed, the definition of "probable cause" states that probable cause is established only after a "pre-filing investigation." *Id*.

Plaintiff also asserts that Defendants acted improperly by referring the criminal investigation to the District Attorney because there was no probable cause to do so.

[Doc. 62, ¶¶ 17, 18] The Court need not determine whether probable cause was lacking, however, because Plaintiff provides no evidence to dispute Defendants' assertion that it was Detective Lobato, not Defendants, who forwarded the matter to the District Attorney. [Defs' SMF, ¶ 18; Pltf's Response, ¶ 18] Indeed, Mora stated that he was not sure "who made the decision" to forward the investigation to the District Attorney, [Mora Depo, Doc. 62-3, 53:15] and Golden stated that the criminal investigation was referred to the District Attorney by the white collar crimes detectives, and that "the exact details of how or why, I don't know." [Defs' SMF ¶ 18 (referring to the "investigating agent"); Golden Depo, Doc. 59-5, 52:7-12; Doc. 59-8 (excerpt from a report by Detective Lobato on the investigation); Doc. 62, ¶ 18] While Plaintiff testified that Mora "had knowledge of the investigation . . . because he [was] in the meeting every week with IA, and they go over every case," [Doc. 59-1, McCoy Depo, 205:13-17] and that Gonzales approved every criminal investigation personally [Doc. 62-1, McCoy Depo, 198:1-5], such testimony is, on its own, mere speculation. *See Bones*, 366 F.3d at 876 (stating that speculative testimony does not raise a genuine issue of fact). Plaintiff adduces no policies or standard operating procedures indicating that Mora or Gonzales oversaw submission of investigations to the District Attorney as a matter of course, and provides no evidence that Golden, Mora, or Gonzales ordered the referral to the District Attorney. Hence, he fails to demonstrate a dispute for trial over whether Defendants ordered or made such a referral.

Finally, Plaintiff alleges that Defendants committed malicious abuse of process by submitting an LEA 90 to the Law Enforcement Academy. [Doc. 62] In response to

Defendants' argument that submission of the LEA 90 is not a "judicial proceeding," Plaintiff argues that the LEA is a "quasi-judicial administrative decision-making body" and that "[t]he initiation of a proceeding of such a nature is closely analogous to a judicial proceeding." [Doc. 62] He argues that the Law Enforcement Academy Board's proceedings are similar to judicial proceedings and "had the potential to lead to punishment . . . analogous to what a court could impose." [Doc. 62] Plaintiff does not cite any New Mexico cases in support of this argument and acknowledges the lack thereof by suggesting that this Court certify the issue of whether an LEA 90 is part of a "judicial proceeding" to the New Mexico Supreme Court. [Doc. 62, n. 1] The Court notes that the New Mexico Uniform Jury Instructions define a "judicial proceeding" as "a criminal prosecution, a civil lawsuit, or an arbitration proceeding," and that New Mexico courts have cautioned against expansion of the malicious abuse of process tort. *Durham*, 2009-NMSC-007, ¶ 29; *Cf. Valencia v. City of Santa Fe*, No. CV 12-137 JCH/WPL, 2014 WL 11430907, at *11 (D.N.M. Feb. 25, 2014) (stating that "[t]he Court finds, as a matter of law, that Plaintiff's administrative disciplinary hearing does not constitute a judicial proceeding for purposes of establishing a malicious abuse of process in New Mexico" where the proceeding at issue was an informal hearing provided for by a collective bargaining agreement).

Even if submission of the LEA 90 could be part of a proceeding as defined by New Mexico courts, however, Plaintiff has failed to dispute Defendants' evidence that submission of the LEA 90 is guided by regulation and is not discretionary. *See* NMAC § 10.29.1.11(E). NMAC § 10.29.1.11(E) provides that

> Any law enforcement agency employing a police officer . . . who has committed, or reasonably appears to have committed, any act in violation of these rules *shall report such conduct to the director within 90 days after the agency initiates an internal affairs review or is otherwise made aware of the alleged misconduct.* . . . Resignation or termination from employment does not relieve the agency from its duty to file a misconduct report with the academy director. Agencies *should undertake a timely and thorough investigation to determine whether an allegation of misconduct is sustained.*

(Emphasis added). It is undisputed that Defendant Mora submitted the form, and the Court notes that the LEA 90 form requires the "Agency Head Signature" before it is submitted. [*See* Doc. 58-9] Although neither party submitted the specific LEA 90 at issue here, viewing the evidence in Plaintiff's favor, it is reasonable to infer that Defendant Gonzales signed it.

Mora testified that it was his responsibility to make sure that the LEA 90 forms were submitted and that he discussed with the sheriff how to comply with NMAC § 10.29.1.11(E). [Doc. 62-3, 55:2 – 556:1] Mora testified about discussions he had with the sheriff as to what the regulations required and how to comply with them:

> Q: So can you tell me who at your office made the decision to submit the LEA 90?

> A: Well, it's my job to make sure that they get submitted. We have statutory authority that the sheriff has to submit these.

> So I've had several conversations with – with the chief of the state police, former LEA director, the acting LEA director, the current LEA director on, you know, giving us some protocol more specific. Because we would—in the past, it . . . would drive me personally crazy that, you know, agencies would utilize the LEA-90—even though we're mandated by the statute to turn them in for misconduct or crimes of moral turpitude, they would use it as a bargaining chip. You know, if you retire or quit, I won't turn this in, and you can just go away.

Q: Sure.

A: It would drive me bananas. So I had a conversation with the sheriff early on. I said, We're not doing that. And he totally agreed. We were on the same page. He's mandated to submit these. We submit them, and whatever the board decides to do with them, that's not our responsibility. But we were going to submit under the guidelines they had published.

[Doc. 62-3, 55:2 – 556:1] Plaintiff provides no evidence controverting Mora's testimony that the LEA 90's are mandated by regulation. In addition, the text of the regulation itself states that an agency "*shall report* [alleged misconduct] to the director within 90 days after the agency initiates an internal affairs review or is otherwise made aware of the alleged misconduct." Moreover, the regulation states that the LEA 90 should be submitted when an officer "has committed, or reasonably appears to have committed, any act in violation of these rules." The regulation thus requires report to the LEA of suspected misconduct, not proven misconduct. Plaintiff has not met his burden to demonstrate a genuine issue of material fact as to whether Defendants took action "that would be improper in the regular prosecution or defense of a claim or charge."

In summary, Plaintiff failed to meet his burden on a motion for summary judgment. First, he failed to provide any evidence that Defendant Houston was involved in the initiation of a criminal investigation or referral to the District Attorney. Second, to the extent he argues that Defendants improperly exerted influence over the District Attorney's office, Plaintiff failed to adduce evidence to that effect. In addition, although Plaintiff argues that there was no probable cause to refer the investigation to the District Attorney, Plaintiff failed to raise a genuine dispute of fact over whether it was Defendants who made or directed the referral. Finally, Plaintiff has not produced any

evidence that Golden was involved in submitting the LEA 90, or tending to show that Mora and/or Gonzales acted improperly in submitting the LEA 90. Summary judgment will be granted in favor of Defendants as to Plaintiff's malicious abuse of process claim.

### 3. Whether Plaintiff has Stated a Claim for Defamation

Defendants argue that Plaintiff's defamation claim should be dismissed because Plaintiff "does not identify the allegedly defamatory communications that he claims [D]efendants made about him." [Doc. 59, pg. 22-23] The Court construes Defendants' motion as a motion to dismiss based on a failure to state a claim for defamation. *See* Fed. R. Civ. P 12(b)(6). Plaintiff does not address this argument in his *Response.* [Doc. 62]

"Generally, the elements of a defamation action include: a defamatory communication, published by the defendant, to a third person, of an asserted fact, of and concerning the plaintiff, and proximately causing actual injury to the plaintiff." *Newberry v. Allied Stores, Inc.*, 1989-NMSC-024, ¶ 16, 773 P.2d 1231; *see* UJI 13-1002(B). In addition, the plaintiff must show that "the defendant knew the communication was false or negligently failed to recognize that it was false." *Young v. Wilham*, 2017-NMCA-087, ¶ 55, 406 P.3d 988. Federal courts apply Rule 8 of the Federal Rules of Civil Procedure when assessing the sufficiency of defamation claim. *See McGeorge v. Cont'l Airlines, Inc.*, 871 F.2d 952, 955 (10th Cir. 1989) (analyzing a defamation claim under Rule 8). Rule 8 generally requires only "a short and plain statement of the claim." Even when applying Rule 8, however, "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context[.]" *Robbins v. Oklahoma*, 519 F.3d

1242, 1248 (10th Cir. 2008). Thus, in 1984, our Tenth Circuit examined the sufficiency of the plaintiff's defamation claim that the defendants "damage[d] [the plaintiff's] reputation by 'representing to third persons and to the public that the fault claimed and defamatory statements made against [the p]laintiff were true." *Pike v. City of Mission, Kansas,* 731 F.2d 655, 661 (10th Cir. 1984) (*overruled on other grounds as stated in Baker v. Board of Regents,* 991 F.2d 628, 633 (10th Cir.1993)). It held that "this allegation is inadequate under Fed. R. Civ. P. 8(a)(2) because it pleads insufficient facts concerning time, place, actors, or conduct to enable defendants to respond." *Id.* In 1989, the Tenth Circuit stated that a defamation complaint must provide "sufficient notice of the communications complained of to allow [the defendant] to defend itself." *McGeorge,* 871 F.2d at 955.

Federal courts relying on a Rule 8 standard have held that some specificity about the allegedly defamatory communication is required in order to give the defendant adequate notice. *See* 50 Am. Jur. 2d § 416 (stating that "[u]nder federal pleading standards, the complaint must at least identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published"). For example, in *Croslan v. Housing Authority for City of New Britain*, the Court found that the plaintiff's allegation that "[defendants] made 'numerous public statements charging [the plaintiff] with lack of skill, mismanagement and general incompetence'" was not sufficiently specific because the plaintiff had failed to "identify the specific subject matter of those statements, the times when the statements were made, and the context in which they were made." 974 F.

Supp. 161, 170 (D. Conn. 1997); *see King-Hardy v. Bloomfield Bd. of Educ.*, No. CIV. 3:01CV979(PCD), 2002 WL 32500923, at *10 (D. Conn. Sept. 17, 2002) (holding that an allegation that defendants had placed "'defamatory material of incompetence . . . in the personnel file' of plaintiff" was insufficient because it did "no more than describe the subject matter of statements made by defendants"). In *Bank of Commerce*, the Court found that the defamation claim was not adequately stated where the claimant asserted that the "plaintiff has made and continues to make wildly inaccurate, baseless and false statements regarding defendant and his business practices, including, . . . that defendant had stolen or otherwise misappropriated funds from his clients [and committed other crimes]" and that "[t]hese false and defamatory statements were communicated to defendant's clients and investors, such as the First State Bank of Livingston, on multiple occasions." *Bank of Commerce & Tr. Co. v. Dominique*, No. CV 07-1332-MLB, 2008 WL 11378844, at *2 (D. Kan. Aug. 22, 2008). The Court stated that these assertions were not sufficient because the claimant "failed to allege who made the statements and to whom the statements were made" and "to give a specific time frame for the alleged statements." *Id.* (footnote omitted). *But see C & M Prop. Mgmt., LLC v. Moark, LLC*, No. 2:15-CV-336-GZS, 2016 WL 1298098, at *3 (D. Me. Mar. 31, 2016) (holding that a claim was stated where the "[p]laintiffs ha[d] identified a specific third person to whom the statements were published, specified a date on which statements were made, and described the content of two allegedly false and defamatory statements); *Cedar Rapids Lodge & Suites, LLC v. JFS Dev., Inc.*, No. 09-CV-175-LRR, 2010 WL 2836949, at *3, *5 (N.D. Iowa July 19, 2010) (stating that the allegations were sufficient because they

"identif[ied] the speaker of the allegedly defamatory statement, the recipient of the statement and what was said," as well as specifically when the statements were made)

Upon review of the *Complaint*, the Court concludes that Plaintiff has states a claim about the alleged defamatory statements with sufficient specificity to permit Defendants to defend themselves. Plaintiff's *Complaint* identifies a specific date on which the allegedly false statements were published, the document in which they were published, the agency to which they were published, and the content of the statements. Defendants are on notice of the precise document in which the subject statements were made. Defendants' *Motion to Dismiss* will, therefore, be denied as to this claim.

### 4. Whether Plaintiff has Stated a Claim for Negligent Hiring, Supervision, Training, Discipline and Retention by Defendant Bernalillo County

Since the Court will dismiss Plaintiff's NMTCA claims against Bernalillo County for failure to provide notice under the NMTCA, there is no need to address Defendants' substantive arguments as to this claim.

Defendants' *Motion* will be granted as to the NMTCA claims against Bernalillo County and as to Plaintiff's malicious abuse of process claims against Defendants Houston, Gonzales, Mora, and Golden. The *Motion* will be denied as to Plaintiff's defamation claim.

### D. Count III

In Count III, Plaintiff asserts "Supervisory and Municipal Liability Claims Under 42 U.S.C. § 1983 for Constitutional Deprivations of Plaintiff's First and Fourteenth Amendment Rights Against Bernalillo County." [Doc. 1-1] Defendants argue that this

claim must be dismissed for failure to state a claim under Rule 12(b)(6). [Doc. 59] Plaintiff did not address this argument in his *Response*. [Doc. 62]

"[A] local government may be held liable for its employees' constitutional violations only when those employees are 'execut[ing the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Lujan ex rel. Lujan v. Cty. of Bernalillo*, 354 F. App'x 322, 326 (10th Cir. 2009) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). For the County to be held liable, Plaintiff must establish (1) an official policy, custom, or practice; (2) deliberate indifference on the part of the County policymakers to the risk that the policy, custom, or practice will result in the deprivation of the rights of BCSO officers; and (3) a direct causal link between the policy or custom and the deprivation of Plaintiff's First Amendment right. *See Schneider v. City of Grand Junction*, 717 F.3d 760, 769-71 (10th Cir. 2013) (discussing elements of a *Monell* municipal liability claim). Although Plaintiff alleges that "the individual Defendants' actions constituted a custom, practice and policy of deliberate indifference to the rights of Plaintiff and other citizens which affirmatively and proximately caused Plaintiff's injuries," he asserts no facts in the *Complaint* relevant to Bernalillo County's policies, nor does he assert any facts from which it could be inferred that Defendants were acting according to a BCSO custom or practice. *Cf. id.* at 770 (stating that a government entity may be liable for a challenged practice where the plaintiff demonstrates that there is "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision"). Plaintiff's

allegations are mere recitations of the elements of the claim and, thus, are insufficient to state a claim. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court will dismiss this claim under Fed. R. Civ. P. 12(b)(6).

## III. Conclusion

*Defendants' Motion for Summary Judgment and Motion to Dismiss* will be **GRANTED in PART** and **DENIED in PART**. Summary judgment is granted as to Plaintiff's First Amendment claims against Defendants Mora, Gonzales, and Golden (Count I). In addition, the *Motion* will be granted as to the NMTCA (Count II) claim against Bernalillo County for negligent hiring, supervision, training, discipline, and retention, and the Supervisory and Municipal Liability claim (Count III) against Bernalillo County. Finally, the *Motion* will be granted as to Plaintiff's malicious abuse of process claims against Defendants Houston, Gonzales, Mora, and Golden. The *Motion* will be denied in all other respects.

Therefore, it is hereby ordered that:

*Defendants' Motion for Summary Judgment and Motion to Dismiss* is hereby **GRANTED** as follows:

- Summary judgment on Count I is granted as to Defendants Mora, Gonzales, and Golden, and to the extent it is based on the Fourteenth Amendment;

- Summary judgment on Plaintiff's malicious abuse of process claim (Count II) is granted as to Defendants Houston, Mora, Gonzales, and Golden;

- Count II as to Bernalillo County is dismissed;

- Count III is dismissed;

*Defendants' Motion for Summary Judgment and Motion to Dismiss* is hereby **DENIED** as follows:

- *Defendants' Motion for Summary Judgment* on Count I is denied as to Defendant Houston;
- *Defendants' Motion to Dismiss* Plaintiff's defamation claim (Count II) is denied.

**SO ORDERED this 13th day of September, 2018.**

_____
**M. CHRISTINA ARMIJO**
**Senior United States District Judge**